IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAHMOUD ALJIBAWI,<br><br>Defendant. | No. 3:21-cr-141 |

## STATEMENT OF FACTS

The United States and the defendant agree and stipulate that the allegations in the Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt, by competent and admissible evidence.

### FACTUAL BACKGROUND

1. West Creek Financial, Inc. ("West Creek") is a retail financing provider based in Glen Allen, Virginia, within the Eastern District of Virginia. West Creek works with retail partners to provide consumer financing, including lease-to-own financing options, on durable goods, such as furniture, appliances, mattresses, HVAC systems, and tires.

2. To become a West Creek retail partner, businesses must submit an application to West Creek by phone or online. Established retail partners can update their account information by phone and through West Creek's online retailer portal.

3. Customers of West Creek's retail partners apply online for lease-to-own financing on qualifying durable goods. Upon approval and West Creek's receipt of the retail partner's invoice, the customer electronically signs a lease agreement with West Creek. Once the retail partner confirms delivery of the good, West Creek remits payment to the retail partner, i.e.,

1

"funds" the partner's account, in the full amount invoiced. Thereafter, West Creek owns the item subject to the lease agreement until the customer repays the lease according to its terms.

4. When West Creek funds the partner's account, the money is transferred electronically to the bank account the partner has designated to receive such funds.

5. West Creek maintains computer servers in the Eastern District of Virginia through which it processes all online activity associated with its retail partners and their customers.

6. Bernie & Phyl's Furniture ("Bernie & Phyl's") is a New England furniture chain based in Norton, Massachusetts, with nine stores, including those in Braintree, Massachusetts; Raynham, Massachusetts; and Nashua, New Hampshire. Bernie & Phyl's is a West Creek retail partner.

7. Okinus, Inc. ("Okinus") and Greenwave Finance, L.L.C. ("Greenwave") are independent lease-purchase program providers based in Pelham, Georgia, and Lehi, Utah, respectively. Like West Creek, Okinus and Greenwave offer lease-to-own financing options on durable goods to the customers of their partner retailers. Okinus and Greenwave fund approved lease accounts by transferring money electronically to the bank accounts that their partner retailers have designated to receive such funds. Okinus and Greenwave also offer and support their financing programs through their proprietary online platforms.

8. Synchrony Bank ("Synchrony") and Wells Fargo are financial services companies headquartered in Stamford, Connecticut, and San Francisco, California, respectively. Synchrony and Wells Fargo are federally insured financial institutions, as defined in Title 18, United States Code, Section 20.

9. Among other services, Synchrony and Wells Fargo each offer retail credit cards through approved merchant retailers who are authorized to facilitate their customers'

applications for credit. Once approved, customers can use the newly opened credit accounts to purchase goods directly from the merchant retailer. Following these purchases, Synchrony and Wells Fargo remit funds to the merchant retailer's designated bank account. The customers are then indebted to Synchrony and/or Wells Fargo in the full amount of the purchase price, plus any interest that later accrues, in accordance with the terms of the cardholder agreement.

10. An Internet protocol ("I.P.") address is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an I.P. address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.

11. HideIPVPN is a subscription virtual privacy network ("VPN") provider that, in exchange for a monthly fee, allows users to connect to its VPN servers. Among other things, HideIPVPN's servers mask users' I.P. addresses from the sites that they access through those servers.

12. HideIPVPN rents servers located in Manassas, Virginia, within the Eastern District of Virginia, from Leaseweb, a cloud computing and web services company headquartered in Amsterdam, Netherlands.

## CRIMINAL CONDUCT

13. Beginning in or about at least April 2017, the exact date being unknown, and continuing through in or about at least January 2022, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, defendant MAHMOUD ALJIBAWI; co-defendants Alaelddin Aljibawi ("A. Aljibawi"), Mohammad Jibawi ("M. Jibawi"), Wael Jibawi ("W. Jibawi"), Jamel Eljebawe ("Eljebawe"), Yanal Khrisat ("Khrisat"); and others, both

known and unknown; did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree to commit wire fraud and bank fraud, that is—

    a.    having knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communications in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing that scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

    b.    knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution as defined under Title 18, United States Code, Section 20, and to obtain money, funds, credits, assets, securities, and other property owned by and under the custody and control of such a financial institution by means of materially false and fraudulent representations and promises, in violation of Title 18, United States Code, Section 1344.

14.    The purpose of this conspiracy was to defraud retail financing providers, including West Creek, Okinus, Greenwave, Synchrony, and Wells Fargo, (collectively "targeted financing providers"), by (1) opening new retail partner accounts and compromising existing retail partner accounts via computer intrusions, and (2) using those new and compromised retail partner accounts to submit materially false information concerning retail sales and leases designed to induce the targeted retail financing providers to remit payments to conspirators that conspirators were not actually owed or entitled to receive.

15.    To further the conspiracy, conspirators maintained various retail furniture businesses located in and around Chicago, Illinois, and elsewhere, including Aladdin Furniture,

Inc.; BB&K Wholesale Corp.; Beds & More, Inc.; Exclusive Furniture, Inc.; Golden Furniture, Inc.; Golden Furniture & Linen, Inc.; Golden Mattress, Inc.; Golden Mattress Plus, Inc.; Interior Furniture & Home Design, Inc.; Interior Furniture & Home Design 1 LLC; Jimmys Furniture Inc.; Madison Furniture & Rugs, Inc.; Madison Discount Rugs and Furniture Inc.; Moe's Furniture Corp.; Moe's Rugs & Furniture, Inc.; Moe's Furniture Galle[t]y, Inc. (sic); Moe's Furniture and Mattress Gallery;[1] Roseland Furniture, Inc.; Roseland Furniture and Mattress Inc.; Value Zone 2 Inc.; Value Zone Furniture Inc.; Value Zone Furniture & Bedding Inc.; Value Zone Furniture 3 Inc.; Value Zone Furniture & Mattress Inc.; and Xclusive Furniture LLC. Some of these businesses maintained physical locations and engaged in transactions apparently unrelated to the instant conspiracy, in addition to others designed to defraud the targeted retail financing providers as described herein. Other businesses maintained no physical locations and engaged in no other transactions. Those businesses were established solely for the purpose of defrauding the targeted retail financing providers as described herein.

16. Conspirators opened and maintained bank accounts at various financial institutions associated with each of the above businesses, including the following accounts: an MB Financial account in the name of Golden Furniture & Linen (last four digits 2839); an MB Financial account in the name of Golden Mattress, Inc. (last four digits 3460); a PNC Bank account in the name of Golden Mattress Plus, Inc. (last four digits 7409); a Fifth Third Bank account in the name of BB&K Wholesale Corp. (last four digits 5281); a Bank of America account in the name of Xclusive Furniture LLC (last four digits 3813); a JP Morgan Chase account in the name of Interior Furniture & Home Design (last four digits 7537); a JP Morgan

---

[1] Although conspirators used this business name to defraud Synchrony Bank (see below), the Illinois Secretary of State has no record of a business entity named "Moe's Furniture and Mattress Gallery." Instead, this business is included among the assumed names for Madison Discount Rugs and Furniture Inc.

5

Chase account in the name of Value Zone Furniture 3 Inc. (last four digits 2681); an MB Financial Account in the name of Madison Discount Rugs and Furniture (last four digits 7290); a Fifth Third Bank account in the name of Madison Discount Rugs and Furniture (last four digits 0792); JP Morgan Chase account in the name of Madison Discount Rugs and Furniture DBA Moe's Furniture and Mattress Gallery (last four digits 5968); a Fifth Third Bank account in the name of Roseland Furniture (last four digits 0578); and a PNC Bank account in the name of Jimmy's Furniture (last four digits 7363).

17. Having established and maintained these businesses and bank accounts, conspirators submitted applications to the targeted retail financing providers through which they sought to establish partner retailer and merchant relationships between those providers and the above businesses. Through these applications, conspirators caused the targeted retail financing providers to approve and onboard several such businesses as approved partner retailers and retail merchants. As a result, the approved businesses were authorized to offer and facilitate lease-to-own financing and retail credit card applications to their customers. On approval, customers could then use these financing options to purchase durable goods from the approved businesses. During the onboarding process, conspirators designated bank accounts that they controlled, including the above accounts, to receive payments from the targeted retail financing providers in connection with such purchases.

18. Having so established these relationships, conspirators submitted to the targeted retail financing providers lease and credit card applications in the names of purported customers. In truth and fact, the majority of these individuals were identity theft victims residing in several states whose personal identifying information conspirators had obtained through various means without those individuals' knowledge or consent. Alongside these individuals' personal

identifying information, conspirators included certain false information, including false addresses, annual income, and intended purchases. The targeted retail financing providers relied on conspirators' affirmations of truth and accuracy of this information in determining whether to approve or deny the submitted applications.

19. When these applications were approved, conspirators conducted various transactions through the newly opened lease and credit card accounts through which they charged the targeted retail financing providers for leases and purchases that did not actually occur. In so doing, conspirators caused the targeted retail financing providers to remit payments to bank accounts designated by conspirators that were not actually owed and to thereby suffer monetary losses when the purported customers failed to make the promised payments.

20. In addition to defrauding the targeted retail financing providers through businesses they had created and controlled, conspirators further defrauded at least one such provider by socially engineering unauthorized access to accounts belonging to that provider's established partner retailers. Specifically, in early 2018, conspirators—posing as employees of various Bernie & Phyl's stores—contacted West Creek's provider support line seeking online access those stores' West Creek partner retailer accounts. Through these social engineering calls, conspirators gained unauthorized access to such accounts and, using Internet-connected computers, made unauthorized changes to those accounts, including changes to the email addresses associated with those accounts and the bank accounts designated to receive lease fund payments from West Creek. To effect these changes, conspirators fraudulently approved and verified the requested changes by receiving, electronically signing, and returning to West Creek via the Internet various electronic documents.

21. After making these changes, conspirators used the Internet to access several compromised retail partner accounts without authorization, including accounts belonging to three Bernie & Phyl's stores located in Massachusetts and New Hampshire. Within those accounts, conspirators identified existing but unfunded customer leases belonging to real people who intended to lease various items from these stores, and electronically submitted those leases to West Creek for funding by falsely claiming that the leased items had been delivered to those customers. In so doing, conspirators caused West Creek to remit lease funds that were not then owed to the bank accounts that conspirators had previously designated, as described herein, causing losses to West Creek.

22. Having defrauded the targeted retail financing providers in these ways, the defendant, A. ALJIBAWI, M. JIBAWI, W. JIBAWI, ELJEBAWE, KHRISAT, and other conspirators obtained money to which they were not entitled. Conspirators accessed and disbursed the resulting proceeds to themselves and others through various transactions, including fund transfers, cash withdrawals, debit purchases, and check payments.

23. To avoid detection, conspirators used various methods to conceal their identities and locations when engaging in the acts described herein, including using prepaid phone numbers and virtual privacy networks, like HideIPVPN.

24. As charged in Count Three, on or about February 5, 2018, conspirators knowingly and with the intent to defraud accessed a protected computer without authorization, specifically, a West Creek protected computer, located in the Eastern District of Virginia, that was then hosting the partner retailer/dealer account of a Bernie & Phyl's store located in Raynham, Massachusetts. By means of this conduct, conspirators furthered the intended fraud—that is, the conspiracy charged in Count One—and obtained from West Creek things of value, to wit, lease

payments totaling at least $16,234.24. Specifically, after accessing the Raynham Bernie & Phyl's store's partner retailer/dealer account, conspirators submitted for funding several leases within that account—falsely representing that Bernie & Phyl's had delivered the subject items— and thereby caused West Creek to remit payments to a Fifth Third Bank account (last four digits 5218) opened in the name of BB&K Wholesale Corp. for the purpose of receiving such fraudulently diverted funds.

25. Among the leases that conspirators submitted for funding on or about February 5, 2018, as charged in Count Three, was a customer lease totaling at least $4,978.90 then pending for Bernie & Phyl's Raynham customer, B.T. By electronically submitting that lease for funding, conspirators knowingly and willfully transmitted and caused to be transmitted by means of wire communications in interstate commerce information relating to that lease—including B.T.'s personal identifying information and account number—from, to, and through computers located in the Eastern District of Virginia to, from, and through computers outside the Commonwealth of Virginia, for the purpose of executing the scheme and artifice to defraud and to obtain money and property by means of materially false, fraudulent, and fictious pretenses, representations, and promises that was the object of the conspiracy charged in Count One and is described herein.

26. At all times relevant to the conspiracy, defendant resided in and around Chicago, Illinois. As confirmed by the Illinois Office of the Secretary of State records, defendant was the registered agent for a domestic corporation named Value Zone Furniture Inc. (incorporated on January 19, 2016, and involuntarily dissolved on June 9, 2017) ("Value Zone Furniture"). Defendant was also identified as a manager or officer for a domestic corporation named Xclusive Furniture LLC (incorporated on September 26, 2017, and involuntarily dissolved on March 11,

2022) ("Xclusive Furniture"). Among others, defendant opened and maintained a Bank of America account in the name of Xclusive Furniture (last four digits 3813). Defendant was the sole authorized signatory on this account.

### A. Exclusive Furniture fraud against Synchrony

27. Beginning in or about June 2017 and continuing through in or about August 2017, conspirators defrauded Synchrony by opening and charging credit card accounts in the names of identity theft victims and others at Exclusive Furniture, Inc. ("Exclusive Furniture"), a domestic corporation registered to another individual, M.A., on October 24, 2016, and involuntarily dissolved on March 9, 2018.

28. On or about June 26, 2017, Synchrony received a merchant application from Exclusive Furniture, which identified M.A. as the business's principal contact. Synchrony approved the application on or about July 3, 2017, permitting the business to offer its customers retail credit card financing through Synchrony.

29. Between July 5, 2017, and August 4, 2017, Synchrony received 28 credit card applications in the names of several individuals, including defendant. Synchrony approved four of these applications, including defendant's. Between July 25, 2018, and August 9, 2017, conspirators used at least three of these retail credit card accounts to charge four transactions totaling at least $21,070.00 at Exclusive Furniture.

30. As confirmed by Synchrony's recorded customers service calls, conspirators first attempted to charge defendant's account on August 4, 2017, in the amount of $6,500.00. Synchrony declined to process this transaction. Conspirators then successfully charged defendant's account on August 9, 2017, in the amount of $2,000.00.

31. Between July 27, 2017, and August 1, 2017, an MB Financial Bank account in the name of Exclusive Furniture (last four digits 9570) received at least 3 deposits totaling at least $18,421.62 from Synchrony. Exclusive Furniture's registered agent, M.A., opened that account on November 26, 2016, and was the sole authorized signatory. The deposits into the Exclusive Furniture MB Financial account (last four digits 9570) comprised payments made in connection with the above credit card transactions.

32. M.A. disbursed the funds deposited into Exclusive Furniture's MB Financial account (last four digits 9570) in connection with the above transactions to himself and others, including defendant, through various transactions, including check payments, online fund transfers, and cash withdrawals.

33. Synchrony ultimately determined that three of the four approved credit card accounts had been opened in the names of identity theft victims. The fourth was defendant's account. Synchrony determined that defendant was then the manager of Exclusive Furniture.

34. On August 11, 2017, defendant called Synchrony to request that the August 9, 2017 transaction of $2,000.00 be refunded to his card, claiming that Exclusive Furniture had failed to deliver his merchandise because Synchrony had not funded their account. In this call, defendant stated that he personally conducted the transaction on August 9, 2017. When advised that the transaction had been approved, defendant stated that Exclusive Furniture's bank account had not been funded for the transaction, because Synchrony had placed a fraud hold on the business's merchant account. After Synchrony advised defendant that the transaction had been processed successfully on his card, defendant terminated the call. Shortly thereafter, Synchrony received another call from the same phone number in which an individual identifying himself as M.A. complained that Exclusive Furniture had not received payment for the August 9, 2017

transaction on defendant's Synchrony credit card. Synchrony advised the caller that Exclusive Furniture's merchant account was to be terminated for confirmed fraud.

### B. West Creek Intrusion Fraud

35. As described herein, conspirators defrauded West Creek in early 2018 by using social engineering calls to gain unauthorized access to existing partner retailer/dealer accounts, including the three Bernie & Phyl's accounts described above.

36. One of the I.P. addresses that conspirators used to gain unauthorized access to these accounts resolves to the business address shared by Golden Mattress, Inc. and Golden Mattress Plus, Inc., domestic corporations registered to co-defendants ELJEBAWE and W. JIBAWI, respectively. That I.P. address is registered to "Jimmy Jibawi" of "Golden Mattress, Inc.," that is, co-defendant, ELJEBAWE. The same I.P. address was used to digitally sign documents directing West Creek to change the bank account of deposit for two Bernie & Phyl's stores; to access at least 123 West Creek dealer accounts; and to submit leases for funding for the Bernie & Phyl's stores located in Nashua, New Hampshire and Raynham and Braintree, Massachusetts. Similarly, the telephone numbers used to socially engineer access to Bernie & Phyl's West Creek partner retailer/dealer accounts are subscribed in the name of A.H., a family member of W. JIBAWI and ELJEBAWE at those defendants' home address in Hickory Hills, Illinois.

37. As a result of these social engineering calls and account compromises, conspirators caused West Creek to remit lease payments to two bank accounts opened and controlled by conspirators—a Fifth Third Bank account in the name of BB&K Wholesale Corp. (last four digits 5281) and the Xclusive Furniture Bank of America account (last four digits 3813).

38. The Fifth Third Bank account (last four digits 5281) was opened by co-defendant KHRISAT on January 23, 2018. KHRISAT was the sole signatory on the account. Between February 5, 2018, and February 12, 2018, that account received at least 35 deposits totaling at least $83,459.08, each of which represented lease payments fraudulently obtained from West Creek through conspirators' unauthorized access of Bernie & Phyl's accounts, as described herein. These deposits were the only amounts credited to the account except for a fund transfer of $11.53, a $2.00 ATM fee refund, and one $50.00 deposit. KHRISAT disbursed the funds deposited by West Creek to himself and other conspirators, including defendant, through various transactions, including check payments and cash withdrawals. KHRISAT closed the account on February 13, 2018, by withdrawing the remaining account balance in cash.

39. Thereafter, conspirators directed West Creek to make all future deposits into the Xclusive Furniture Bank of America account (last four digits 3813). Defendant opened that account on or about October 16, 2017, and was the sole authorized signatory. Between February 14, 2018, and February 28, 2018, that account received at least 25 deposits totaling at least $55,469.11, each of which represented lease payments fraudulently obtained from West Creek through conspirators' unauthorized access of Bernie & Phyl's accounts, as described herein. Defendant disbursed the funds deposited by West Creek to himself and other conspirators, through various transactions, including check payments and cash withdrawals.

C. **Xclusive Furniture fraud against Synchrony**

40. Beginning in or about January 2018 and continuing through in or about June 2018, conspirators defrauded Synchrony by opening and charging credit card accounts in the names of identity theft victims at Xclusive Furniture, a domestic corporation associated with defendant.

41. Between January 4, 2018, and June 21, 2018, the Xclusive Furniture Bank of America account (last four digits 3813) received at least 37 deposits totaling at least $535,952.76 from Synchrony. Synchrony had previously received and approved a merchant application from Xclusive Furniture, permitting the business to offer its customers retail credit card financing through Synchrony. Approximately 133 Synchrony Mega Group credit cards were charged at Xclusive Furniture between January 2, 2018, and June 25, 2018. Synchrony received numerous victim claims from the named cardholders indicating that they had not made or authorized these purchases. These victims resided in several different states, including Illinois, California, Pennsylvania, Texas, and Florida. Synchrony ultimately determined that more than 95 percent of the transactions were fraudulent after the accounts went into default. As a result, Synchrony terminated its merchant relationship with Xclusive Furniture on August 8, 2018.

42. Defendant disbursed the funds deposited into Xclusive's Bank of America account (last four digits 3813) in connection with these transactions to himself and other conspirators through various transactions, including check payments and cash withdrawals.

D. **Value Zone Furniture frauds against Okinus and Wells Fargo**

43. Between in or about June 2018 and continuing through in or about December 2018, conspirators defrauded multiple retail financing providers by fraudulently opening lease and credit card account in the names of identity theft victims and conducting transactions on those accounts at Value Zone 3 for leases and purchases that did not actually occur.

44. On or about June 20, 2018, Okinus received and approved a merchant application from "Value Zone Furniture," permitting the business to offer its customers lease-to-own financing through Okinus. The merchant application identified co-defendant A. ALJIBAWI as the only point of contact for this business.

45. Between July 31, 2018, and September 19, 2018, a JP Morgan Chase account in the name of Value Zone Furniture 3 Inc. ("Value Zone 3") (last four digits 2681) received at least 37 deposits totaling at least $115,836.13 from Okinus. Co-defendant A. ALJIBAWI opened that account on June 11, 2016, and was the sole authorized signatory. During the period in Okinus made deposits into that account, Okinus received 114 applications for financing through "Value Zone Furniture," of which it approved 53. The deposits into the Value Zone 3 JPMC account (last four digits 2681) comprised payments for 37 of the approved leases. Although Okinus had approved the remaining 16, those accounts were voided for fraud before Okinus had remitted payment to Value Zone 3.

46. Okinus received numerous victim claims from the named lessees indicating that they had not made or authorized any purchases at "Value Zone Furniture." Okinus ultimately determined that more than 99 percent of the transactions were fraudulent after the accounts went into default. As a result, Okinus terminated its merchant relationship with "Value Zone Furniture."

47. A. ALJIBAWI disbursed the funds deposited into Value Zone 3's JPMC account (last four digits 2681) in connection with the above transactions to himself and other conspirators, including defendant, through various transactions, including check payments, online fund transfers, and cash withdrawals.

48. Between December 11, 2018, and December 13, 2018, the Value Zone 3 JPMC account (last four digits 2681) received at least 3 deposits totaling $78,388.78 from Wells Fargo. Wells Fargo had previously received and approved a merchant application from "Value Zone Furniture," permitting the business to offer its customers retail credit card financing through Wells Fargo. Between December 10, 2018, and December 13, 2018, Wells Fargo received 13

customer credit card applications via "Value Zone Furniture." The business charged nine of those accounts for purchases at or near the credit limit.

49. Wells Fargo flagged these transactions as potentially fraudulent and, on December 18, 2018, contacted co-defendant A. ALJIBAWI to request full documentation. A. ALJIBAWI provided some documents via fax the same day. On December 20, 2018, A. ALJIBAWI contacted Wells Fargo to advise that he was having difficulty locating the requested documentation. On December 24, 2018, Wells Fargo contacted A. ALJIBAWI and advised him that full documentation was required for each of the identified accounts. A. ALJIBAWI failed to provide the requested documentation, causing Wells Fargo to submit a chargeback on December 28, 2018, for the funds remitted to the Value Zone 3 JPMC account (last four digits 2681). Wells Fargo was notified on December 31, 2018, that the merchant, "Value Zone Furniture," had blocked the chargeback.

50. Ultimately, Wells Fargo received numerous victim claims from the named cardholders indicating that they had not made or authorized any purchases at "Value Zone Furniture." These victims resided in several different states, including Minnesota, New York, Texas, and Florida.

51. Between December 11, 2018, and December 14, 2018, A. ALJIBAWI disbursed the funds deposited by Wells Fargo into Value Zone 3's JPMC account (last four digits 2681) in connection with the above transactions to himself and other conspirators, including defendant, through various transactions, including check payments, online fund transfers, and cash withdrawals.

### E. Moe's Furniture & Mattress Gallery fraud against Synchrony

52. Between in or about August 2018 and continuing through in or about April 2019, conspirators further defrauded Synchrony by submitting conducting fraudulent credit card transactions at Madison Discount Rugs and Furniture, DBA Moe's Furniture & Mattress Gallery. Madison Discount Rugs and Furniture, Inc. was a domestic corporation registered to S.J., a relative of co-defendant M. JIBAWI, on May 5, 2016, and dissolved on October 11, 2019. Synchrony had previously received and approved a merchant application from the business on or about July 26, 2018, permitting the business to offer its customers retail credit card financing through Synchrony. In connection with that application, Synchrony conducted two site inspections at the business. M. JIBAWI was present at each and identified himself as the manager of the business.

53. In the merchant application, the owner, S.J., designated an MB Financial Bank account in the name of Madison Discount Rugs & Furniture (last four digits 7290) to receive payment from Synchrony for customer credit card purchases. M. JIBAWI and S.J. were the two authorized signatories on this account. Between August 9, 2018, and October 12, 2018, the account received at least 13 deposits totaling at least $19,648.51 from Synchrony in connection with purchases purportedly made at Moe's Furniture & Mattress Gallery. Conspirators disbursed the funds deposited into the Madison Discount Rugs and Furniture MB Financial account (last four digits 7290) in connection with these transactions to each other and others through various transactions, including check payments and online fund transfers.

54. On September 19, 2018, S.J. opened a JP Morgan Chase ("JPMC") account in the name of Madison Discount Rugs and Furniture Inc., DBA Furniture and Matress Gallery (sic) (last four digits 5968). M. JIBAWI was added as an authorized signer on this account on

September 21, 2018. On October 5, 2018, Synchrony received a request to change Moe's Furniture & Mattress Gallery's bank account to the Madison Discount Rugs and Furniture JPMC account (last four digits 5968). Between November 8, 2018, and April 2, 2019, this account received at least 33 deposits totaling at least $381,316.72 from Synchrony in connection with purchases purportedly made at Moe's Furniture & Mattress Gallery. Conspirators disbursed these funds to themselves and others, including defendant, via large cash withdrawals, online fund transfers, and check payments.

55. In total, Synchrony identified at least 59 Mega Group credit card accounts that were fraudulently opened and charged at Moe's Furniture & Mattress Gallery between August 7, 2018, and April 3, 2019. Synchrony received numerous victim claims from the named cardholders indicating that they had not made or authorized any transactions at Moe's Furniture & Mattress Gallery. These victims resided in several different states, including Illinois, Rhode Island, Massachusetts, Pennsylvania, North Carolina, Texas, Florida, and California. Synchrony terminated its merchant relationship with Moe's Furniture & Mattress Gallery on May 16, 2019.

56. Defendant admits that between in or about at least April 2017 through in or about at least January 2022, he knowingly and intentionally conspired with A. ALJIBAWI, M. JIBAWI, W. JIBAWI, ELJEBAWE, KHRISAT, and others to execute and attempt to execute a scheme to defraud a financial institution as defined under Title 18, United States Code, Section 20, and other retail financing providers, and to obtain money, funds, credits, assets, securities, and other property owned by and under the custody and control of such a financial institution and others by means of materially false and fraudulent representations and promises; that, for the purpose of executing the scheme and artifice to defraud, conspirators caused to be transmitted writings, signs, and signals in interstate and foreign commerce; and that, in furtherance of this

conspiracy, defendant knowingly committed, aided, abetted, induced, counseled, and encouraged the acts described herein with the specific intent to defraud.

57. Defendant further acknowledges that the merchant and financing applications submitted to the targeted retail financing providers and the telephone calls conspirators made to those providers were wire transmissions that passed in interstate commerce, thus satisfying the jurisdictional element for wire fraud, in violation of 18 U.S.C. § 1343. The transfer of funds by the targeted retail financing providers to the bank accounts conspirators designated to receive were also wire transmissions passing in interstate commerce.

58. Defendant admits that he personally profited from the conduct described herein in the amount of at least $514,744.80.

59. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offense charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _Kaitlin G. Cooke_
Kaitlin G. Cooke
Assistant United States Attorney

By: _[signature]_
Carla Jordan-Detamore
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, MAHMOUD ALJIBAWI, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____4/13/22_____   _____
Date                             MAHMOUD ALJIBAWI
                                  Defendant

I am counsel for defendant, MAHMOUD ALJIBAWI. I have carefully reviewed this Statement of Facts with him and, to my knowledge, his decision to agree to this Statement of Facts is an informed and voluntary decision.

Date: __4/13/2022__   _____
                                  Steven B. Muslin
                                  Pro Hac Vice Counsel for the Defendant

Date: __4/13/22__     _____
                                  William Dinkin
                                  Local Counsel for the Defendant

20