IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| v. ) | Case No: 3:21-CR-00141-001 |
| ) | |
| **MAHMOUD ALJIBAWI,** ) | |
|       **Defendant.** ) | |

### DEFENDANT'S SENTENCING MEMORANDUM
### AND MOTION FOR VARIANCE SENTENCE

COMES NOW, the defendant Mahmoud Aljibawi, by counsel, and submits his Sentencing Memorandum and Motion for a Variance Sentence.

### Introduction and Summary of Sentencing Position

Mr. Aljibawi will appear before this Court on October 18, 2022 for sentencing on his plea of guilty to Count One of the Indictment, Conspiracy to Commit Wire Fraud and Bank Fraud in violation of 18 U.S.C. § 1349, Count Three, Accessing a Protected Computer in Furtherance of Fraud, in violation of 18 U.S.C. § 1030(a)(4), and Count Six, Wire Fraud, in violation of 18 U.S.C. § 1343. Count One is punishable by up to 30 years of imprisonment, a fine of up to $1,000,000, or twice the gross gain or loss; full restitution; and not more than five years of supervised release and a $100 special assessment; Count Three is punishable by up to five years imprisonment, a fine of the greater of $250,000 or twice the gross gain or loss; full restitution, and up to 3 years of supervised; Count Six is punishable by up to 20 years imprisonment, a fine of the greater of $250,000 or twice the gross gain or loss, full restitution, and up to 3 years of supervised release. There is no mandatory minimum sentence.

Under the United States Sentencing Guidelines, ("USSG" or "Guidelines"), Mr. Aljibawi has zero criminal history points and is in Criminal History Category I. *See* Presentence

Investigation Report, ("PSR"). ¶ 46.[1] He has a total offense level of 26, PSR, ¶ 44, and an advisory Guidelines range of 63 - 78 months incarceration. PSR, ¶ 69.

Mr. Aljibawi does not object to the calculation of the Sentencing Guidelines. However, Mr. Aljibawi moves for a variance sentence of 36 months pursuant to the factors in 18 U.S.C. § 3553(a), which is sufficient but not greater than necessary to achieve the goals of sentencing. Until the conduct that brings Mr. Aljibawi before this Court, he had lived a life defined by devotion to family and hard work. Numerous friends and family have written on his behalf and note how extremely out of character his conduct was in this case. Mr. Aljibawi has demonstrated extreme remorse for his actions and has written a heart-felt letter to the Court expressing his regret and the lessons he has already learned. He is very unlikely to become involved in behavior like this again and lengthy incarceration is not necessary to deter or incapacitate him or to protect the public. A sentence of 36 months is sufficient to serve the goal of general deterrence, reflects his more limited role in the offense than other participants in the conspiracy and is consistent with the sentences in other cases in the Eastern District of Virginia for like behavior.

**Sentencing Argument and Incorporated Motion for Variance Sentence**

After *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are advisory and courts of appeal review sentences for reasonableness. *See United States v. Hughes*, 401 F.3d 540, 546-47 (4th Cir. 2005). In *Rita v. United States,* 127 S.Ct. 2456 (2007), the Supreme Court stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range. The district court must then consider all of the factors listed in § 3553(a) and determine if they support the sentence requested by a party.

---

[1] Paragraph 46 of the PSR notes that there is an active bench warrant outstanding for Mr. Aljibawi for failing to complete community service on a disorderly conduct charge from 2005. Mr. Aljibawi learned about the warrant from the Pretrial Services Report prepared in this case after his arrest. He thereafter hired counsel in New York and the matter was resolved in February, 2022. *See* Exhibit 1, payment receipt from New York Criminal Court.

"In so doing, he may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38 (2007) (citing, *Rita*). "It has been uniform and constant in the federal judicial tradition for the sentencing judge *to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate*, sometimes magnify, the crime and the punishment to ensue." *Id*. (citing *Koon v. United States*, 518 U.S. 81, 113 (1996) (emphasis added)). Indeed, the Court in *Gall* rejected a rule that required "extraordinary circumstances" be found to impose a sentence outside of the guidelines. *Gall*, 552 at 47.

The statutory factors that must be considered in determining a just sentence include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

The primary directive of § 3553(a) is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. A sentencing court must therefore impose the minimally sufficient sentence that accomplishes the statutory purposes of sentencing.

*Application of Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)*

The Sentencing Reform Act does not favor "one purpose of sentencing over another," except that rehabilitation is not to be a reason to impose a sentence of incarceration. *See* S. Rep. No. 98-225, at 67 (1983). Thus, Congress sought to establish a system of sentencing wherein "each of the four stated purposes should be considered in imposing a sentence in a

3

particular case," and "one purpose of sentencing may have more bearing on the imposition of sentence in a particular case than another purpose has." *Id*. at 68. Thus, a sentencing court must consider all of the purposes and factors set forth in 18 U.S.C. § 3553(a) and the sentence to be imposed "is a question to be resolved after balancing all the relevant considerations." *Id*. at 119.

*Section 3553(a)(1) Offender Characteristics*

Mr. Aljibawi was born on May 31, 1982, in Brooklyn, New York, to Nazih and Najah Aljibawi, and is the eldest of eight siblings. PSR, ¶ 52. His father immigrated to United States from the West Bank in the Middle East in 1980, and his mother followed shortly thereafter. *See* Exhibit 2, Letter of Mahmoud Aljibawi. His father and his oldest brother ran a bodega on Eastern Parkway in Brooklyn, New York. *Id*. Mr. Aljibawi describes being raised in an extremely close and hardworking extended family where all his needs were met and positive values were instilled. He states that:

> At first, we lived in a Park Slope apartment with my uncle and his family. We got along well and supported each other. My father worked long hours while my mother stayed home to take care of me and my siblings. There were no drugs, alcohol, or violence in my home. We prayed together and lived a simple, peaceful life.
>
> I attended P.S. 124 where I earned average grades. My neighborhood friends and I spent time playing sports in Prospect Park. We had a good time and did not go looking for trouble. My cousins, my siblings, and I took good care of each other. As the oldest sibling, my parents expected me to look out for my younger siblings, keep them safe, and show them the right way to behave.
>
> When I was ten, we moved to Sunset Park. We lived in our own apartment across the street from Nael and his family. My father sold the bodega and starting driving a yellow cab. My cousin shared that cab with my father while my uncle drove for a car service. At home, my parents ran an orderly household. They had strict rules about doing our homework and taking our education seriously. I respected my parents and followed their rules. Also, my father struggled with arthritis and bad asthma, so I helped take care of him.

*Id*.

When he was 14 years old, Mr. Aljibawi and two siblings were sent to live for two years

in the West Bank with extended family. He indicates that "[w]e lived by traditional values: respecting and obeying our elders, being kind to our neighbors, and working hard. I remember working on our family farm, planting olive trees, and helping my grandfather harvest the olives." *Id*. When he returned to New York, he attended Pershing High School then Franklin Delano Roosevelt High School in Borough Park. He indicated that he mostly kept to himself to avoid the frequent conflict and fighting at school and that he "attended culture and religion classes at our mosque [and] felt a positive connection to my community and enjoyed an active, healthy lifestyle." *Id*. One of his great regrets is that he dropped out of high school at the age of 17. *Id*., p. 2. He did, however, later graduate from an online high school. PSR, ¶ 60.

Mr. Aljibawi has a long history of steady employment. He began working at age 18, first at his uncle's pillow factory in Park Slope, Brooklyn. Exhibit 2, p. 2. He also opened his own flea market stand at the Aqueduct in Brooklyn selling home goods like sheets, comforters, and blinds. *Id*. At the same time, he also worked as a driver for Legends Car & Limo Service and indicates that he did well on a steady work schedule while living at home with my parents. *Id*. In 2004, the family moved from Brooklyn to Clifton, New Jersey and he began working at a family member's gas station in Denville, New Jersey, where for the next three years he managed the 2 pm to midnight shift, seven days a week. *Id*. In 2012, Mr. Aljibawi and his brother Rami opened Bobby's Home Fashion, a retail home goods store in Orange, New Jersey, where he sold linens, comforters, curtains, and blankets that we purchased from wholesalers in New York and New Jersey. *Id*. In 2016, he moved his family to Chicago, where he worked in his uncle's furniture and home goods store, Auntie's Linen. The store did not do well and closed within a year. *Id*. From 2017 to 2020, Mr. Aljibawi owned and operated Xclusive Furniture in Chicago. PSR, ¶ 63. He also worked at his brother-in-law's furniture store, New Age Furniture. PSR, ¶ 62. Since

2020, Mr. Aljibawi has owned World Wide ATM with his brother-in-law, a company that owns and operates ATMS in several states. PSR, ¶ 61; Exhibit 1, p. 4.

While Mr. Aljibawi has demonstrated a strong work ethic throughout his adult life, his commitment to family is even stronger. On June 1, 2008, he married Safieh Aljibawi, and together they have three sons who are 3, 8 and 3, respectively. PSR, ¶ 54. He expresses that he "love[s] being a father and [is] grateful for my happy marriage" but recognizes that "because of my actions, my entire family, especially my three sons, will suffer the shame of my crime for the rest of their lives. I am truly heartbroken and devastated that I used such terrible judgement." Exhibit 2, p. 3. Mr. Aljibawi's wife describes him as "a devoted father who is involved in all of their children's activities, including volunteering at their schools." Exhibit 3, p. 8 (private PSR prepared by Jacqueline A. Schmidt, MSW, APSW, Sentencing & Dispositional Consultant). His wife also observes that Mr. Aljibawi "is someone who puts other's needs before his own" and that, because his father has health issues and is unable to work, he has been paying their mortgage and other expenses. Mrs. Aljibawi noted that Mahmoud also takes care of his younger siblings. *Id*. Others have also commented on Mr. Aljibawi's strong devotion to his family. Mervet Shabna states that he is [a]lways known for putting in work to help his family (mother, father & younger siblings) . . . [and] working for his very own family, Wife and children." Exhibit 4 (Letter of Mervet Shabna). His cousin Nader Ihmoud indicates that "Mahmoud is a devoted husband and unbelievable father" and that he and his wife "are model parents, as is evidenced by the kind, intelligent and respectful children they have developed." Exhibit 5 (Letter of Nader Ihmoud). Likewise, friend Hussein Silmi states that "Mahmoud is, first and foremost, a dedicated family man. He is invested in his children [and] his love for his family is apparent in how they interact with each other and how he prioritizes them." Exhibit 6 (Letter of Hussein

Silmi).

Mr. Aljibawi's supporters also describe him as kind and generous. His former employee Tommy Washington recounts that "[h]e is the best boss I have ever had," and that "he treats all his employees very well." Exhibit 7 (Letter of Tommy Washington). Mr. Washington further states that he "often had financial problems and needed extra money, and Mahmoud has helped me out. He is very kind and generous. He has also helped other people when they have financial problems or need any business help. He cares about all people, even strangers." *Id*. Frank Moreno, the owner of a car wash frequented by Mr. Aljibawi, notes that "he treats the men and women who work here with dignity and respect. He knows their names and even asks about their families." Exhibit 8 (Letter of Frank Moreno). The office manager of Mr. Aljibawi's mosque observes that he "has been an active member of our mosque, participating in youth ministry, leadership programs, etc., and attending weekly services." Exhibit 9 (Letter of Zakaria Abdelhalim). He further notes that Mr. Aljibawi and his family "also participated in volunteer work and have gone out of their way to help others during times of need." *Id*. Others state that he "is a truly good person" who "takes extremely good care of his family," Exhibit 10 (Letter of neighbor Sherrie M. Mezyk), and that his "integrity and moral character is beyond reproach." Exhibit 11 (Letter of friend Matthew McMahel).

Mr. Aljibawi's wife describes how out-of-character her husband's actions were: "He never believed in taking shortcuts" and therefore she "never would have expected him to get involved in something like this." Exhibit 3, p. 8. She postulates that "[a]t the time of the offense, they were going through an especially difficult time because they had just bought a house, she was pregnant with their third child, and business was slow" and that "all of Mahmoud's financial responsibilities became overwhelming to him, and he made some poor choices." *Id*. The offense

7

conduct and his arrest have caused Mr. Aljibawi significant mental anguish. He now suffers from panic attacks, which are currently untreated. PSR, ¶ 58. In his personal letter, he indicates that he has been dealing with the stress of the charges and pending sentencing by abusing alcohol. Exhibit 2, p. 5. He recognizes that this has become a problem and he is asking the Court to include in its sentencing order a recommendation that he receive both substance abuse treatment and mental health treatment.

To his credit, once confronted with his misdeeds by law enforcement, Mr. Aljibawi immediately accepted responsibility for his actions. He has demonstrated extraordinary remorse for his behavior, stating that:

> Looking back, I see that I was greedy and reckless. I didn't connect my actions to harm done to real people. I see it differently now. Since my case began, I found out about more the entire conspiracy. I felt embarrassed when I saw how many companies and individuals were hurt and how much money was stolen. It is wrong to manipulate financing companies for personal gain. It was a major criminal fraud and I am ashamed that I was part of it.

Exhibit 1, p. 4. Many of the individuals who have provided character letters on Mr. Aljibawi's behalf have also observed that his behavior in this matter was out of character and that he has expressed his deep remorse to them. Mr. Aljibawi's father states that he was "shocked and surprised" by his son's behavior. PSR, ¶ 53. His friend Hussein Silmi indicates that "he has shared his remorse for the mistakes ha has made," Exhibit 6, and Frank Moreno states that "[h]e was sad and remorseful when he told me about his situation." Exhibit 8.

### *Section 3553(a)(2)(B) – The Nature and Circumstances of the Offense*

The Presentence Report and the Statemen of Facts filed in this case accurately outline the offense conduct. It is important to note, however, that Mr. Aljibawi was not involved in every aspect of the criminal activity conducted by the co-conspirators and outlined in the indictment. For example, he was not involved in conducting the "social engineering" calls to West Creek

8

Financial that gained access to the Bernie & Phyl's account. PSR, ¶ 17. Nor did he have a part in procuring the means of identification used in the fraudulent activity. Rather, Mr. Aljibawi's primary role was to allow the use of his legitimate furniture store's relationship with financing companies to be exploited by fraudulently obtaining financing payments. Of the $1,773,076.32 in intended loss attributable to his store's accounts, Mr. Aljibawi's gain was a more modest $512,313.91. Mr. Aljibawi proffers to the Court that a substantial portion of that amount was withdrawn by him in cash from his store's bank account at Bank of America and distributed back to the subset of co-defendants who provided the means of identification to perpetuate the fraud. Consistent with that, there is no evidence of any exorbitant spending by Mr. Aljibawi of the kind this Court often sees in fraud cases. Finally, to his credit, Mr. Aljibawi ceased the criminal activity in or about 2019, several years before he was aware of the investigation into his activity. PSR, ¶ 22. In contrast, some of his co-conspirators continued to perpetuate the same scheme against another financing company, Kafene, Inc., Mr. Aljibawi was not involved. PSR, ¶ 18 – 20.

<u>*Section 3553(a)(2)(B) – The Need for Adequate Deterrence*</u>

A lengthy prison sentence is not necessary to deter Mr. Aljibawi from committing new crimes. He recognizes the wrongfulness of his actions, accepted responsibility from the moment of his arrest and has demonstrated significant remorse. The best deterrence in this case is ensuring that he obtains adequate treatment for his substance abuse and mental health rather than spending time behind bars where his condition can only be exacerbated. In addition, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of

the evidence." *Id, see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

### *Section 3553(a)(2)(C) The Need for Incapacitation*

A sentence longer than 36 months is not needed to incapacitate Mr. Aljibawi. Even with a 36-month sentence, he will be in his mid-forties before being released. The Sentencing Commission has found that "[r]ecidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates." *Measuring Recidivism: The Criminal History Computation of The Federal Sentencing Guidelines*, May 2004. Mr. Aljibawi is married, has children and the strong support of his family who will serve as a bulwark against re-offending. He has both the desire and personality to engage with mental health and substance abuse therapy and to reintegrate himself back into his community.

### *Section 3553(a)(2)(D) The Need for Rehabilitation*

While Mr. Aljibawi requires both substance abuse and mental health treatment, a sentence of longer than 36 months is not necessary to achieve the rehabilitative goals of sentencing. In that time period, he can participate in programs offered by the Bureau of Prisons and prepare himself for a successful release.

### *Section 3553(a)(4) – The Guidelines*

The Guidelines in this case call for a sentence of 63 – 78 months. It is worth noting that, *first*, the intended loss amount in this case of $1,773,076.32 is near the bottom of the $1,500,000 to $3,500,000 band under USSG § 2B1.1(b)(1)(I) that imposes an additional 16 levels for loss. *Second*, while it is not argued that Mr. Aljibawi was a minor participant pursuant to USSG §

3B1.2(b), his role in the conspiracy was more limited than others involved in the conspiracy.[2] As noted above, he was not involved in any of the social engineering aspects of the case and he had no role whatsoever in procuring the means of identification used to perpetuate the fraud. Rather, while he ran a legitimate furniture store, (not a front like some of the other co-defendants), he used his store's financing accounts to fraudulently obtain credit payments, which he mostly distributed to the co-conspirators who obtained the identifying information and organized the scheme. *Third*, while there is no case law to support an argument of double counting, Mr. Aljibawi's Guidelines were increased a total of six levels, under three separate provisions, on account of the same conduct of fraudulently using means of identification. First, his offense level was increased two points because the offense involved 10 or more victims. PSR, ¶ 34. Unlike the several financial institutions who were victims because of a pecuniary loss, these victims were counted because their means of identification were unlawfully used. *See* USSG § 2B1.1, App. Note 4(E). Mr. Aljibawi's offense level was increased another two points because the offense involved the possession of five or more means of identification pursuant to USSG § 2B1.1(b)(11)(C)(ii). PSR, ¶ 35. Finally, his offense level was increased an additional two points because he was convicted under 18 U.S.C. § 1030 and the offense involved an intent to obtain personal information. PSR, ¶ 36. If the court were to consider, for analytical purposes, consolidating the increase for this identical conduct to only a two-points, Mr. Aljibawi's Guidelines offense level would be 22 and his sentencing range would be 41 – 51 months, even without taking into consideration the other mitigating arguments made herein.

---

[2] While the private PSR obtained by Mr. Aljibawi recommends a minor role reduction, see Exhibit 3, p. 11, counsel's experience in this Court mitigates against making this argument as an objection to the Guidelines calculation; similarly, while the private PSR makes excellent points in favor of its recommendation that this Court impose a sentence of probation with intermittent confinement and/or home detention, counsel is mindful of the sentences imposed in this jurisdiction for similar crimes and is not seeking a probationary sentence.

### *Section 3553(a)(4) – The Kinds of Sentences Available*

This Court must also consider all of "the kinds of sentences available" by statute, §3553(a)(3). Congress has directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Sat.1987, 2039 (1984).

Consistent with the foregoing provision, as recently as November 6, 2013, the Director of the Federal Bureau of Prisons testified before the Senate Judiciary Committee concerning issues faced by the Bureau, including over-crowding. He emphasized that the Department of Justice is "urging prosecutors in appropriate circumstances involving non-violent offenses to consider alternatives to incarceration" to help alleviate cost and crowding issues in the federal prisons. *See* Statement of Charles E. Samuels, Director, Federal Bureau of Prisons, to the Senate Judiciary Committee, p. 8 (http://www.judiciary.senate.gov/pdf/11-6-13SamuelsTestimony.pdf).

In the present case, Mr. Aljibawi is a non-violent offender who is amendable to rehabilitation. While it is not argued that a non-custodial sentence be imposed, a shorter custodial sentence combined with the strictures of supervised release will achieve the goals of sentencing.

The Supreme Court has recognized that non-custodial components of sentences constitute a "substantial restriction of freedom," further stating:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights,* 5 34 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court. App. 109. *Id.* at 595-96 (footnote omitted).[3]

*Gall v. United States*, 552 U.S. 38, 48 (2007).

*Section 3553(a)(6) – The Need to Avoid Unwarranted Sentencing Disparities*

A downward variance sentence in this case would not be an anomaly in this District and would not result in a disparate sentence to others charged with financial crimes. The Sentencing Commission's Interactive Data Analyzer was used to determine the rate of downward variances in this Eastern District of Virginia for defendants in Criminal History Category I. *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard. In 2020, courts in this District granted a non-government sponsored downward variance in 52.0% of the cases (specifically, in 26 out of 50 cases). *See* Exhibit 12. In 2021, court in this District imposed downward variances in 41.7% of cases (35 out of 84 cases). *Id*. In this case, Mr. Aljibawi has zero criminal history points, has

---

[3] The *Gall* Court noted that " '[p]robation is not granted out of a spirit of leniency.... As the Wickersham Commission said, probation is not merely 'letting an offender off easily,' ' " 552 U.S at 48, n.4 (citing Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957)), and " 'the probation or parole conditions imposed on an individual can have a significant impact on both that person and society.... Often these conditions comprehensively regulate significant facets of their day-to-day lives.... They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a caseworker or psychotherapist.'" *Id.* (citing 1 N. Cohen, The Law of Probation and Parole § 7:9 (2d ed.1999) (brackets omitted)).

committed an offense that was wildly out-of-character and for which he has expressed deep remorse. His role in the offense is reduced compared to others involved in the conspiracy and his Guideline level is elevated because of multiple enhancements for essentially the same conduct. It would not be inconsistent with other similarly situated defendants, under these circumstances, to impose a variant sentence of 36 months.

### *Conclusion*

For the foregoing reasons, Mr. Aljibawi respectfully requests that this Court impose a variance sentence of 36 months, to be followed by supervised release, and mental health treatment. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals of 18 U.S.C. § 3553(a).

Respectfully submitted,

MAMOUD ALJIBAWI

By: _____/s/_____
William J. Dinkin
VSB # 31198
Counsel to defendant
William J. Dinkin, PLC
101 Shockoe Slip, Suite J
Richmond, VA 23219
P: 804-359-0000
F: 804-257-5555
bill.dinkin@dinkinlaw.com
Tel. (804) 359-0000
Fax (804) 257-5555

### C ERTIFICATE OF SERVICE

I hereby certify that on the 5th day of October, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

        Carla Jordan-Detamore, and
        Kaitlin G. Cooke
        Assistant United States Attorneys
        Office of the U.S. Attorney
        Suntrust Building
        919 E. Main St.
        Suite 1900
        Richmond, VA 23219-2447
        (804) 819-5400

        _____/s/_____
        William J. Dinkin
        VSB # 31198
        Counsel to Defendant
        William J. Dinkin, PLC
        101 Shockoe Slip, Suite J
        Richmond, VA 23219
        P: 804-359-0000
        F: 804-257-5555
        bill.dinkin@dinkinlaw.com
        Tel. (804) 359-0000
        Fax (804) 257-5555